**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:17-cr-00117-NT |
| | ) | |
| MST MINERALIEN SCHIFFAHRT | ) | |
| SPEDITION UND TRANSPORT | ) | |
| GMBH, et al. | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO**
<u>**DEFENDANTS' MOTION TO DISMISS**</u>

Now comes the United States of America, by its undersigned attorneys, and respectfully submits this response in opposition to defendants' Motion to Dismiss.

**SUMMARY**

Defendants concede that their cargo vessel, the *M/V Marguerita*, discharged oily wastes into the ocean, and failed to properly record those discharges and disposals in its Oil Record Book as required. Defendants' contend, however, that they are immune from criminal liability in the United States because the discharges and false Oil Record Book entrees were made by crewmembers while the vessel was in international waters. This contention fails to appreciate the nature of the instant offenses. Pursuant to the Act to Prevent Pollution from Ships (APPS), 33 U.S.C. § 1908(a), defendants were required to keep and maintain an accurate Oil Record Book aboard the *M/V Marguerita* when it entered United States' waters and ports in Maine at least seven times between 2016 and 2017. Thus, defendants violated APPS by entering the jurisdiction of the United States knowing that the ship's Oil Record Book was false and inaccurate because it failed to record the discharge and disposal of oily wastes from the vessel.

## FACTUAL BACKGROUND

The *M/V Marguerita* is a Liberian-flagged[1], ocean-going bulk carrier, with a gross tonnage of 19,104 tons, and a length of 612 feet.  The vessel is owned by Reederei MS "MARGUERITA" GmbH & Co. Geschlossene Investment KG (Reederei).  The vessel's operator is MST Mineralien Schiffarht Spedition und Transport GmbH (MST).  Both companies share the same physical address in Schnaittenbach, Germany.

At the time of the instant offenses, MST was required to conduct routine audits of its vessels and implement stricter oversight of its vessels' record-keeping, as the result of a court-ordered environmental compliance plan (ECP).  Specifically, in July 2016, MST pled guilty in the District of Minnesota, in case number 16-CR-134(JNE/LIB), to violating APPS, and was sentenced to pay a $1 million fine and placed on probation with the ECP as a special condition of probation.  The conviction was the result of MST's intentional discharge of oily wastes from the *M/V Cornelia* from February 2015 to October 2015, while the vessel was in operation in the Great Lakes.

The *M/V Marguerita* has a crew of approximately 24 individuals.  Approximately ten crewmembers work in its engine room, including a Chief Engineer, Second Assistant Engineer, two Third Assistant Engineers, a Cadet, a Fitter, a Wiper, two Oilers, and an Electrician.  The engine room crew is responsible for managing the operation of the ship's engine room machinery, and for managing the oily bilge waste, also known as machinery space bilge water, which is a regular byproduct of the vessel's operation.

Lukas Zak was employed as a Wiper aboard the *M/V Marguerita*, and worked in the vessel's engine room.  Shortly after starting in September 2016, he learned of a system used to

---

[1] The flag state is the nation where an oceangoing vessel is registered; in this case, Liberia is the flag state of the *M/V Marguerita*.

improperly discharge machinery space bilge water from the vessel via transfers of bilge waste amongst several internal tanks used in other ship processes. According to Zak, Chief Engineers Ante Barbarovich and Gunnar Becker ordered him to install and replace portions of the system used to make these discharges. Zak recalled that the vessel discharged bilge waste into the ocean on three or four occasions while he was aboard the ship. The first discharge occurred in October 2016, and the last discharge was before the vessel arrived at Duke Point, Canada on [date of arrival].

Damir Kordic was employed as an Oiler aboard the *M/V Marguerita*, and also worked in the vessel's engine room. Kordic was employed aboard the ship from June to December 2016, and again beginning April 2017. Consistent with Zak's recollection, Kordic confirmed that bilge wastes were transferred between other internal tanks and eventually discharged to the ocean. Kordic recalled that tanks were discharged to the ocean every time the vessel left port.

None of these discharges, disposals, or internal tank transfers of machinery space bilge water were recorded in the vessels Oil Record Book as required by the Act to Prevent Pollution from Ships (APPS) or MARPOL. Between October 2016 and April 2017, the *M/V Marguerita* made seven port calls in Maine, at either the Port of Portland or the Port of Searsport. On each occasion, the vessel entered United States' waters with a false and fictitious Oil Record Book that omitted the discharge and disposal of machinery space bilge water into the ocean.

On May 12, 2017, Jaroslav Hornof joined the vessel's crew as a third engineer. After joining the crew, Hornof learned from Zak that the vessel was illegally discharging oily bilge wastes. Thereafter, Hornof reported this activity to the ship's Master, Captain Ivan Babel, and on May 22, 2017, Hornof recorded a video of this activity and sent it to MST representatives. Two

days later, on May 24, Hornof recorded a second video in which he took samples of the oily bilge water.

On May 29, 2017, the vessel arrived in Duke Point, Vancouver, Canada.  Captain Babel notified MST of the discharges prior to the ship's arrival, and the ship's superintendent, Sebastian Pavlovich, met the vessel there to conduct an inspection.  Also arriving in Duke Point was Captain Peter Demcak, who joined the vessel to relieve Captain Babel.  According to Demcak, Babel confirmed that the vessel had been improperly discharging waste into the sea.  Thereafter, Alexandr Miklas, MST's "Designated Person Ashore" (DPA) and Corporate Compliance Manager, asked Demcak to "collect evidence" for MST.

Prior to the vessel's departure from Duke Point, Pavlovich completed his inspection and left the vessel.  Thereafter, Pavlovich wrote an "Internal Inspection Report" for MST.  The report appears to have been completed on either May 31, 2017, or June 5, 2017.  In the report, Pavlovich noted problems with the handling of bilge wastes but stated that presently, "[a]ll procedure with bilge water, drain water to be under control, recorded properly and [Oily Water Separator] kept in working condition . . . ."

After Demcak arrived on the vessel, he began collecting evidence for MST.  Demcak interviewed Hornof, reviewed the video recorded by Hornof and the vessel's Oil Record Book entrees, and collected written statements from some of the engineering officers.  Demcak completed this process by June 16, 2017, when the ship arrived in Panama.

On June 19, 2017, a month after Hornof's videos, three weeks after the vessels' port call in Canada, and at least two weeks after Pavolvich's internal inspection report was completed; Miklas sent an email to the District of Minnesota, prosecutors, and others, regarding the oil

discharges.  In the email, Mr. Miklas suggested that the illegal discharges had just recently been

discovered and that the scope of the conduct was unclear.  The email specifically stated:

> Earlier today, Monday, June 19, 2017, in accordance with shipboard reporting requirements, MST Mineralien Schiffahrt Spedition und Transport GmbH received an unsigned, one-paragraph type-written note from the Third Engineer alleging that the vessel's Chief Engineer had not accurately recorded the handling of vessel's bilge water in the Oil Record Book.  As of this time, incomplete information has been received concerning the suspicious conduct and a comprehensive investigation into the incident has been initiated by the vessel's Owner and Manager.

Def.'s Motn. to Dism., Ex. 4 at 2.

The same day, Demcak ordered Chief Engineer Babrovich to make an entry in the vessel's

Oil Record Book.  The text of the entry was provided to Demcak by Miklas via email.  The entry

stated:

> On June 19, 2017, a type-written note from a member of the engineering department was received by the vessel's manager in accordance with the vessel's safety management system and reporting requirements.  The note alleged that the handling of vessel's bilge water had not been accurately memorialized in the oil record book.  The matter is under investigation and has been reported to the vessel's flag administration and classification society.  One or more entry(s) in the oil record book may be inaccurate and/or missing and the contents of the book should not be relied upon at present.

Def.'s Motn. to Dism., Ex. 8 at 2.

From June 24 to 26, 2017, the vessel was in Beleem, Brazil.[2]  There, an audit was

conducted by Matthew Long of Compliance Systems, Inc.  Compliance Systems, Inc. is the

Independent Consultant under the terms of the ECP and was asked to conduct an environmental

---

[2] While the vessel was in Brazil, Babarovich and the vessel's Second Engineer departed and were replaced.  Their departure from the vessel was prior to the expiration of their contract, and neither were available to meet with U.S. Coast Guard Inspectors when the vessel arrived in Maine.  Babrovich no longer works for MST.  Likewise, Captain Babel was terminated by MST.  Further, it appears that the crewmembers who served aboard the *M/V Marguerita* when it arrived in Portland, Maine, in July 2017, have also been terminated and are unemployed.  The government has been unable to obtain further details on the termination of these crewmembers, some of whom have worked for MST for years.

audit and investigation into the handling of bilge water.  Long interviewed crewmembers and inspected the ship during the audit.

Long found that illegal discharges were occurring from the vessel.  Specifically, Long interviewed Chief Engineer Babarovich, who admitted to intentionally discharging machinery space bilge water from the vessel.  Babarovich advised he did this 3 to 4 times, most recently when the vessel was near Duke Point, Canada.

Long reviewed ship logs that documented quantities of oil and oily wastes in the ship's tanks.  Specifically, Long compared the daily Tank Sounding Log, a log recording daily measurements of the vessel's tanks signed by the oiler and chief engineer, with the Monthly Tanks Inventory log and the Oil Record Book, both signed by the Master and Chief Engineer.[3]  Long found that entrees in the Oil Record Book were inconsistent with the Tank Sounding Log and the Monthly Tanks Inventory.  Further, Long found that the Oil Record Book failed to document the internal tank transfers reported by Zak, Kordic, and Hornof, or the discharge of oily bilge wastes into the ocean.

On June 28, 2017, attorneys for the defendants wrote a letter to the United States Coast Guard regarding "an alleged incident involving possible unrecorded discharge(s) of bilge water by an engineering officer."  Def.'s Motn. to Dism., Ex. 7 at 3.  The letter again noted that additional details were not provided to MST until June 19, 2017, and that the inspection in Brazil "seem to corroborate (at least in part) some [of] the allegations . . . ."  Def.'s Motn. to Dism., Ex. 7 at 3.

On July 7, 2017, the United States Coast Guard Inspectors boarded the *M/V Marguerita* following its arrival in Portland, Maine.  Inspectors conducted a Port State Control examination,

---

[3] The ECP, ordered as part of MST's probation in the District of Minnesota, required MST to maintain the Tank Sounding Log and the Monthly Tanks Inventory aboard the *M/V Marguerita*.

interviewed the vessel's engineering crew, and confirmed that the crew had been directed, on multiple occasions, to transfer machinery space bilge water overboard.  During the inspection, Hornof recovered a portion of pipe used to conduct the discharges and provided it to the USCG inspectors.[4]

USCG inspectors took samples from various points along the piping system and from tanks aboard the vessel.  These tanks and pipes, if used properly, should not contain any traces of petroleum.  Nevertheless, petroleum was present in the samples taken from these locations.

## ARGUMENT

### I.      The Indictment clearly states a violation of United States law.

The Act to Prevent Pollution from Ships (APPS), 33 U.S.C. §§ 1901 to 1915, implements two related treaties to which the United States is a signatory: the 1973 International Convention for the Prevention of Pollution from Ships; and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships.  Together, the two treaties are generally referred to as "MARPOL."  APPS makes it unlawful to knowingly violate MARPOL, APPS, and federal regulations promulgated thereunder.  *See* 33 U.S.C. §§ 1907(a); 1908(a).  APPS provides criminal sanctions for knowing violations.  *See* 33 U.S.C. § 1908(a).

APPS requires that ships of 400 gross tons and above, such as the *M/V Marguerita*, maintain an Oil Record Book in which all discharges of machinery space waste are fully and accurately recorded without delay.  *See* 33 C.F.R. 151.25.  Entries are required in the Oil Record Book on each occasion involving: (1) a disposal of oil residue from the machinery spaces, 33 C.F.R. § 151.25(d)(3); (2) a "discharge overboard or disposal otherwise of bilge water that has accumulated in machinery spaces," 33 C.F.R. § 151.25(d)(4); or (3) "an emergency, accidental or

---

[4] USCG inspectors took possession of the pipe in front of Hornof and the current Chief Engineer, Iurii Sharov.  At that time, Sharov told Hornof in Russian, "you should have thrown the pipe away."

other exceptional discharge of oil or oily mixture." 33 C.F.R. § 151.25(g). This includes operations involving both overboard discharges from tanks and tank-to-tank transfers, 33 C.F.R. § 151.25(d). Further, these operations "shall be fully recorded without delay in the Oil Record Book so that all the entries in the book appropriate to that operation are completed." 33 C.F.R. § 151.25(h). And each completed operation must be signed by the person or persons "in charge of the operation concerned." 33 C.F.R. § 151.25(h). Finally, the Oil Record Book must "be kept in a place as to be readily available for inspection. . . . " 33 C.F.R. § 151.25(i).

APPS regulations require foreign ships, such as the *M/V Marguerita,* to not only make all required entries, but also to underline maintain an accurate Oil Record Book while in United States ports and waters. *See* 33 U.S.C. § 1902; 33 C.F.R. §§ 151.09, 151.25 (emphasis added). "Maintain," which is defined as "to keep in a state of . . . validity," *see* Webster's Third International Dictionary (Unabridged) (1966), requires a record to be kept truthfully, completely, and accurately. *See United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 309 (2d Cir. 2009) ("In the context of a regulation imposing record-keeping requirements, the duty to 'maintain' plainly means a duty to maintain a reasonably complete and accurate record."). Thus, the crux of an APPS Oil Record Book violation is the entry into waters of the United States with a fictitious Oil Record Book. *See United States v. Jho*, 534 F.3d 398, 404 (5th Cir. 2008) (noting that the gravamen of an APPS violation is "not the pollution itself, or even the Oil Record Book violation occurring [in international waters], but the misrepresentation in port.") (internal quotation marks omitted).

Because an Oil Record Book must be maintained accurately, an APPS offense is completed when a person knowingly causes a vessel to enter United States ports and waters with a false Oil Record Book. *United States v. Sanford Ltd.*, 880 F.Supp.2d 9, 15 (D.D.C. 2012) ("[A]n APPS ORB violation under 33 C.F.R. § 151.25 takes place at the moment a vessel enters a U.S. port with

an inaccurate ORB.").  *See also Ionia Mgmt*, 555 F.3d at309 ("APPS's requirement that subject ships 'maintain' an ORB, 33 C.F.R. § 151.25, mandates that these ships ensure that their ORBs are accurate (or at least not knowingly inaccurate) upon entering the ports or navigable waters of the United States"); *Jho*, 534 F.3d at 403 ("we read the requirement that an oil record book be 'maintained' as imposing a duty upon a foreign-flagged vessel to ensure that its oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States."); *United States v. Abrogar*, 459 F.3d 430, 435 (3rd Cir. 2006) ("As such, the precise nature of Abrogar's 'offense of conviction' under the Guidelines is most accurately described as 'failure to maintain an accurate oil record book while in the navigable waters of the United States.'").

Certainly, the United States has unfettered jurisdiction to prosecute violations of its national laws that occur within its borders, including the internal waters and ports of the United States.[5]  In this case, crimes occurred at the time senior crewmembers caused the *M/V Marguerita* to enter waters of the United States with a fictitious Oil Record Book in the Ports of Portland and Searsport, Maine.   Both ports are within the "baseline" at which the territorial sea begins and thus, within internal waters of the United States.  33 C.F.R. § 2.20.  Because the offenses are crimes committed and continued in the internal waters and ports of the United States—over which the United States has unfettered jurisdiction—the United States has jurisdiction to prosecute the violations in this case.  *See United States v. Royal Caribbean*, 11 F. Supp. 2d 1358, 1371 (S.D.

---

[5] *See, e.g., United States v. Diekelman*, 92 U.S. 520, 525 (1875) (merchant vessels of one country "visiting the ports of another . . . subject themselves to the law which governs the port that they visit, so long as they remain"); *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 142 (1957) ("It is beyond question that a ship voluntarily entering the territorial limits of another country subjects itself to the laws and jurisdiction of that country."); *Nevada v. Hall*, 440 U.S. 410, 416 (1979) (domestic jurisdiction is absolute for crimes committed within borders of a country); *United States v. Louisiana*, 470 U.S. 93, 98 (1985) (nation has same "complete sovereignty" over internal waters as over its land territory).

Fla. 1998) ("*Royal Caribbean I*") ("Presentation of a false Oil Record Book seems more appropriately characterized . . . as an essentially domestic law violation over which the United States properly has jurisdiction.").

Defendants incorrectly suggest that MARPOL provides exclusive jurisdiction to the *M/V Marguerita's* flag state.[6]  Def.'s Motn. to Dism. at 9-10.  Contrary to defendants' assertion, MARPOL specifically provides concurrent jurisdiction to port states, such as the United States. MARPOL Art. 4(2), and expressly allows any party to institute proceedings according to the party's domestic law, against someone who violates the convention and the party's domestic laws within its jurisdiction.  *See* MARPOL Art. 4(2)(a).  Furthermore, APPS specifically applies to foreign flagged ships while in the navigable waters of the United States or while at a United States port.  *See* 33 U.S.C. § 1902; 33 C.F.R. § 151.09(a)(5).  Indeed, nothing in MARPOL or APPS suggests that the United States gave up any of its sovereignty to proscribe or prosecute conduct occurring within its internal waters and ports.  *United States v. Pena*, 684 F.3d 1137, 1147 (11th Cir. 2012) (noting that under MARPOL and APPS, "Congress has neither explicitly nor implicitly surrendered complete jurisdiction to the Flag State.").  Thus, MARPOL does not preclude the United States from prosecuting offenses occurring within its jurisdiction.  *See Royal Caribbean I*, 11 F. Supp. 2d at 1371 (rejecting argument that United States may only refer to flag state a violation of MARPOL Oil Record Book requirements occurring in port, where entries were made outside of port); *United States v. Royal Caribbean Cruises, Ltd.*, 24 F. Supp. 2d 155, 159-60 (D.P.R. 1997) ("*Royal Caribbean II*") (neither MARPOL nor customary international law divest the United

---

[6] Defendants also incorrectly suggest that the United Nations Convention on the Law of the Sea (UNCLOS) precludes the U.S. Coast Guard's inspection of the *M/V Marguerita*, and the present criminal prosecution.  As the Fifth Circuit held in *Jho*, "[n]either UNCLOS nor the law of the flag doctrine encroaches on the well-settled rule that a sovereign may exercise jurisdiction to prosecute violations of its criminal laws committed in its ports. Far from signaling an abdication of this traditional authority, the APPS indicates Congressional willingness to criminalize knowing violations of MARPOL, the APPS, and APPS regulations committed by foreign-flagged ships while in United States' ports and navigable waters."  *Jho*, 534 F.3d at 409.

States of jurisdiction over conspiracy and false statements charges, among others; MARPOL provides concurrent jurisdiction to port states); *United States v. Petraia Maritime, Ltd.*, 483 F. Supp. 2d 34, 39 (D. Me. 2007) (holding that international law did not limit the jurisdiction of the United States to bring a criminal prosecution under APPS for the failure to maintain an Oil Record Book while in port, even where the false entries concerned discharges beyond the jurisdiction of the United States).

**II.     Defendants' "innocent Master" defense is deficient.**

The defendants argue that the indictment does not articulate an offense occurring within the United States because: (1) inaccurate Oil Record Book entries were made by the vessel's engineers while in international waters; (2) only the vessel's Master, not its engineers, are responsible for maintaining the Oil Record Book; and (3) there are no allegations that the Master knew the Oil Record Book was inaccurate at the time it entered waters of the United States.  Def.'s Motn. at 14-16.  The defendants' argument fails because it incorrectly analyzes the interplay between criminal liability as a principle, and criminal liability as an aider or abettor, pursuant to 18 U.S.C. § 2.

As an initial matter, the defendants were charged with both committing the substantive APPS offense, in violation of 33 U.S.C. § 1908(a), and aiding, abetting, or causing the offense under 18 U.S.C. § 2.  Pursuant to Section 2:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Therefore, a defendant "may be indicted as a principal for the commission of a substantive crime and convicted upon evidence that he or she aided and abetted only." *United States v. Walser*, 3 F.3d 380, 388 (11th Cir. 1993).

In the present case, the indictment alleges that the defendants "acting through [their] agents and employees . . . did knowingly fail to maintain an Oil Record Book . . . ." *See* Dkt. 1. The indictment further alleges that the defendants aided, abetted, or caused the offense pursuant to 18 U.S.C. § 2(a) and (b). Accordingly, the defendants violated APPS if the actions of their employees aided, abetted, or caused the Master of the vessel to maintain the record books improperly. *See United States v. Penagaricano-Soler*, 911 F.2d 833, 843 (1st Cir. 1990) (Bank employee, who had no duty to file Currency Transaction Reports (CTR), was criminally liable as an aider and abettor where he caused the Bank to evade its CTR filing requirements); *United States v. Cure*, 804 F.2d 625, 629 (11th Cir. 1986) ("[A customer] with no duty to file CTRs can be prosecuted . . . on account of aiding and abetting a financial institution's failure to file CTRs.").

Importantly, the defendants committed an APPS violation regardless of the Master's knowledge of or culpability for the substantive offense. "It is the known and familiar principle of criminal jurisprudence, that he who commands, or procures a crime to be done, if it be done, is guilty of the crime, and the act is his act. This is so true*, that even the agent may be innocent,* when the procurer or principal may be convicted of guilt, as in the case of infants or idiots, employed to administer poison." *United States v. Gooding*, 25 U.S. 460, 469 (1827) (emphasis added). *See also, e.g., United States v. Dodd*, 43 F.3d 759, 762 (1st Cir. 1995) ("A defendant may be convicted under [18 U.S.C. § 2] even though the individual who did in fact commit the substantive act lacked the necessary criminal intent."); W*alser*, 3 F.3d at 388 ("[A]n individual is criminally culpable for causing an intermediary to commit a criminal act even though the

12

intermediary has no criminal intent and is innocent of the substantive crime); *United States v. Tobon-Builes*, 706 F.2d 1092, 1099 (11th Cir. 1983) ("[I]t is well established that § 2(b) was designed to impose criminal liability on one who causes an intermediary to commit a criminal act, even though the intermediary who performed the act has no criminal intent and hence is innocent of the substantive crime charged . . . ."); *United States v. W. Indies Transp.*, *Inc.*, 127 F.3d 299, 307 (3d Cir. 1997) (same); *United States v. Causey*, 835 F.2d 1289, 1291 (9th Cir. 1987) (where defendant was convicted of aiding and abetting tax evasion by helping others file unknowingly false tax returns, held that a "person who causes the commission of an offense is punishable as a principal even though the person who completes the wrongful act violates no criminal statute because of lack of intent or capacity"); *United States v. Levy*, 969 F.2d 136, 141 (5th Cir. 1992) ("Under 18 U.S.C. §2(b), there is no requirement of shared intent; only the person charged need have the criminal intent, the individual whom the defendant has caused to perform the act *may be entirely innocent*.") (emphasis added).

Here, Chief Engineer Babarovich, a MST employee, was required to record the transfer, discharge, and disposal of oil and oily wastes for the *M/V Marguerita*.  He knowingly failed to do this, and the Oil Record was false and fictitious.  The Master of the vessel was required to maintain an accurate Oil Record Book when the vessel entered the United States.  When the *M/V Marguerita* entered the District of Maine on at least seven occasions, the book was false and fictitious.  These seven port calls occurred before any allegedly "corrective" notation was made in the Oil Record Book.[7]  Thus, Chief Engineer Babarovich, an agent of the defendants, caused the failure to

---

[7] Contrary to the implication of the defendants in their argument, the so-called "corrective entry" made in the Oil Record Book on June 19, 2017, does not make the Oil Record Book accurate.  Nevertheless, there is no need to argue its sufficiency, or lack thereof, as there are no APPS violations charged in the Indictment after June 19, 2017, the date of the entry.  Defendants further characterize their June 28, 2017, letter as a "voluntary disclosure" and suggest that the U.S. Coast Guard Maritime Law Enforcement Manual recommends against criminal prosecution in this case.  Def.'s Motn. to Dism. at 6 n.10.  This suggestion is incorrect as defendants do not meet the requirements of the policy because they: (1) are recidivist entities; (2) delayed reporting the conduct for 37 days after receiving video of the

maintain an accurate Oil Record Book, in violation of APPS.  Accordingly, the defendants are liable for violating APPS pursuant to 18 U.S.C. § 2 and 33 U.S.C. § 1908(a).

### III.    *Fafalios* **offers no respite.**

The defendants rely on the Fifth Circuit's decision in *United States v. Fafalios*, 817 F.3d 155 (5th Cir. 2016), and argue that the government "cannot extend the liability for aiding and abetting to corporate defendants through a theory of vicarious liability."  Def.'s Motn. at 15.  In *Fafalios*, the defendant was employed as the chief engineer of a foreign-flagged vessel, which was required to maintain an Oil Record Book under APPS and MARPOL.  *Fafalios*, 817 F.3d at 156. Following trial, the defendant was convicted as a principle for failing to maintain an Oil Record Book, in violation of APPS, 33 U.S.C. § 1908(a).  *Id.*  On appeal, the Fifth Circuit reasoned that the defendant, as chief engineer, "no doubt was required to record the [oil discharges]" pursuant to 33 C.F.R. § 151.25(h), and "ignored that requirement when he failed to make such an entry." *Id.* at 159.  However, because the omitted and false entries occurred in international waters on a foreign-flagged vessel, the defendant could not be prosecuted for entering the false information in the record book under APPS.  *Id.*  The Fifth Circuit noted that "under the plain language of the regulations, only the 'master or other person having charge of the ship' is responsible for the maintenance of the oil record book."  *Id.* at 158, citing 33 C.F.R. §§ 151.25(a), (j).  Thus, because the illegal act occurred once the vessel entered the United States with a record that was falsely maintained, the Court held that Fafalios could not be liable under APPS because only the master "has a duty to maintain the record book."  *Id.* at 131.

---

illegal activity; (3) were vague in their initial report, despite having full knowledge of the illegal activity; and (4) failed to provide the U.S. Coast Guard with access to all employees knowledgeable of the conduct by removing crew from the ship prior to its arrival in Portland.  Moreover, the decision to seek criminal charges is a decision solely within the discretion of the government.  "In our criminal justice system, the Government retains broad discretion as to whom to prosecute."  *Wayte v. United States*, 470 U.S. 598, 607 (1985).

Although the Court in *Fafalios* held that a chief engineer could not be convicted as a principal, it acknowledged that the defendant could be convicted as an aider and abettor under 18 U.S.C. § 2.  Relying on the Fifth Circuit's previous decision in *United States v. Jho*, 534 F.3d 398 (5th Cir. 2008), the Court specifically noted that chief engineers "may be prosecuted for aiding and abetting the failure to maintain an accurate record book . . . ." *Fafalios*, 817 F.3d at 131.  In *Jho*, the defendant was employed as a chief engineer and was charged with aiding and abetting the failure to maintain an oil record book.  *Jho*, 534 F.3d at 401.  On appeal, like the instant defendants, the defendant argued that he could not be prosecuted under 33 U.S.C. § 1908 because he was not the "master or other person having charge of the ship." *Id.* at 402 n.1.  The Fifth Circuit rejected this argument, however, stating that "[e]ven assuming this to be true, it is inapposite as the government charged [the defendant] with aiding and abetting the oil record book offenses." *Id.*

Accordingly, because they were indicted under both 33 U.S.C. § 1908(a) and 18 U.S.C. § 2, the Fifth Circuit's opinion in *Fafalios* provides the defendants with no basis to dismiss the indictment.  Consequently, the defendants' Motion to Dismiss should be denied.

### IV.    The Rule of Lenity is inapplicable.

Defendant's reliance on the rule of lenity is also misplaced.  The rule of lenity only applies if a statute is ambiguous, *see, e.g., United States v. Yermian*, 468 U.S. 63 (1984), which is not the case here.  MARPOL, APPS, and the regulations thereunder are more than sufficiently clear as to rule out the application of the rule of lenity.  As the *Royal Caribbean I* court found in 1998, "the right of the Coast Guard to board a vessel and inspect the log is well-established in maritime law, and the consequences of misrepresenting pollution discharges – regardless of the applicable statute – cannot be said to be so unclear so as to mandate lenity." 11 Supp.2d at 1366.

## CONCLUSION

The government respectfully submits that defendants violated APPS by entering the jurisdiction of the United States knowing that the ship's Oil Record Book was false and inaccurate because it failed to record the discharge and disposal of oily wastes from the *M/V Marguerita*. Accordingly, the defendants' motion to dismiss should be denied.

HALSEY B. FRANK
UNITED STATES ATTORNEY

JEFFREY H. WOOD
ACTING ASSISTANT ATTORNEY GENERAL
United States Department of Justice
Environment and Natural Resources Division

Date:   November 27, 2017

*/s Shane N. Waller*
Shane N. Waller
Trial Attorney, Environmental Crimes Section
601 D St. NW
Washington, DC 20009
(202) 305-0362
shane.waller@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have filed the foregoing Response to Defendants' Motion to Dismiss, with the Clerk of Court, and provided notice to counsel for defendants by sending the response electronically to:

George Michael Chalos
Email: gmc@chaloslaw.com

Peter Rodway
Email: rodlaw@maine.rr.com

*/s Shane N. Waller*
Date:  November 27, 2017
Shane N. Waller
Environmental Crimes Section
United States Dept. of Justice