UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

UNITED STATES OF AMERICA,

    *Plaintiff*

v.

MST MINERALIEN SCHIFFAHRT
SPEDITION UND TRANSPORT GMBH, *et al.*,

    *Defendants*

CASE No.: 2:17-cr-00117-NT

U.S. DISTRICT COURT
DISTRICT OF MAINE
PORTLAND
RECEIVED & FILED

2018 NOV -2 A 8: 51

_____
DEPUTY CLERK

## MOTION OF JAROSLAV HORNOF, DAMIR KORDIC AND LUKAS ZAK FOR RELIEF and AN AWARD PURSUANT TO 33 U.S.C. § 1908(a)

NOW COME Jaroslav Hornof, Damir Kordic and Lukas Zak, by and through their counsel, and pursuant to 33 U.S.C. § 1908(a) of the Act to Prevent Pollution from Ships and this honorable Court's inherent power, move the Court for leave to be heard concerning any plea agreement between the Government and the Defendants that provides for one or more convictions under section 1908. Movants respectfully also request awards from any fine imposed on any such conviction or for the dismissal of any such counts.

In support of this Motion, the movants respectfully rely on their previous filings related to this matter and further state as follows:

1.    The movants have all made extensive arrangements to travel from their homes in eastern and central Europe to be available as trial witnesses this month. Mr. Kordic who is disabled, unemployed and bankrupt scrambled this week to procure a visa to replace the visa the government had "cancelled" without explanation. Mr. Zak arranged a week's vacation from his new shore-based employment. Mr. Hornof arranged to leave his family and shore-based commitments.

2. After more than a week passed without confirmation that the government had made agreed-upon flight reservations, the movants this Wednesday inquired through counsel concerning their status. Counsel was then told (also on Wednesday) that the parties "anticipate a resolution" and "believe" the travel will no longer be necessary. The movants remain on standby.

3. The movants unsuccessfully requested disclosure of the plea terms. The deadlines prescribed by the Court's standard docket entry for the filing (and therefore public disclosure) of plea agreements and a prosecution version have passed. Accordingly, the movants respectfully request leave to supplement this motion once disclosure is made. For reasons summarized below, however, the movants anticipate the parties structured any plea agreement to restrict the Court's ability to make fair awards under section 1908.

4. The movants of course acknowledge this Court and the First Circuit concluded they are not victims within the meaning of the Crime Victims' Rights Act. As movants do not expect to seek further review of that ruling, they accept the result and appreciate the Court's previous and ongoing attention to their plights, and concerns.

5. The First Circuit's Judgment also provided, however, "Nothing herein shall preclude the district court from hearing from the petitioners if it chooses to do so." [Docket No. 163.]

6. And, of course, in ruling that the movants had no right independent of the CVRA to be heard concerning the previous plea agreement that called for the dismissal of all APPS counts, the Court explained,

> The movants cite cases where informants under APPS were allowed certain due process rights to adjudicate the issue of the award. The problem is that these are all cases that did arise under an APPS count. Here the Government is not proceeding under an APPS count. And although movants urge me to apply section 1908 regardless, I just don't see how I can do that.

2

[Tr. 9/6/18 hearing, p. 66.] If either defendant pleads guilty to an APPS count, those previously cited cases would be on point.[1] Accordingly, the movants respectfully submit that in that event they would have a due process right to be heard. In any event, they respectfully ask the Court to choose to hear from them in light of their extraordinary actions in ending the pollution; their invaluable cooperation with the U.S. government (summarized among other places in the government's trial brief [Docket 108]; the devastating losses they have suffered; and the movants' treatment by the defendants and the government.

7. The gravamen of the Indictment is that the foreign owner and operator of a Liberian-flagged vessel, the *M/V Marguerita*, failed to maintain an accurate oil record book at times when the vessel was in the Port of Portland, Maine, in violation of the regulations under the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901, *et seq.*, in light of pre-port-call discharges from the vessel on the high seas governed by the international regime known as MARPOL. The Indictment includes nine counts. The first eight counts charge violations of the APPS. The final count charges "obstruction of justice" (18 U.S.C. § 1519) for the same alleged failures to maintain an accurate oil record book. Count Nine, however, is mentioned only in passing in government's trial brief (at page 12).

8. The movants are foreign nationals who were crewmembers of the *M/V Marguerita* when she arrived at the Port of Portland on July 7, 2017. Well before the vessel's arrival the movants had shut down, but also documented the improper discharges, and disclosed or caused the disclosure of those discharges and false record entries to the defendants, the MARPOL Administration (the Republic of Liberia in this case), and the United States.

---

[1] The cases are cited and discussed in detail in the movants' Memorandum . . . Concerning Their Standing, docket No. 8 in 18-mc-127.

3

9. The government's trial brief summarized the three brave seafarers' efforts as beginning "shortly after [Hornof] join[ed] the vessel [on May 12, 2017, when] he learned of the illegal discharges from Zak" on the high seas. In fact, Mr. Hornof observed Zak and Kordic being directed to set up for an improper discharge. The vessel had altered piping designed for the lawful purpose of catching high volumes of tropical condensate from the engine's cooling system before it reached the bilges and, using pumps and hoses, to discharge the clean condensate through the ship's gray water system (non-sewage dirty water). Chief Engineer Babarovic, however, ordered Zak and Hornof to add a pump and hose to the system, which effected illegal discharges of oily bilge water.

10. Hornof explained that what Babarovic was ordering was illegal. With their assistance, Hornof set about to prove it, document it, and end it. Hornof confronted Babarovic, who falsely claimed that only clean condensate was being discharged. So Hornof took his complaints to the Master and the shore-based officials with MST. They seemed to side with Babarovic, who then threatened Hornof. Rather than back down, Hornof secretly made multiple videos, prepared written summaries, took samples from key tanks deep in the ship's bilges, studied the ship's logs including the ORB, and provided detailed oral reports to the Master and the defendants.

11. The three movants then cooperated with the defendants' investigation, which began in Hornof's first port of call – Vancouver, British Columbia. By now MST seemed to believe Hornof. He was promised a detailed MARPOL audit in the next port of call (Brazil) and was asked to ensure no further pollution occurred, which he did.

12. The movants cooperated with the audit in Brazil, which resulted in a report of well over 100 pages including exhibits. The government and the MARPOL administration were told in advance the audit would be completed as a result of a report from the Third Engineer.

When the auditor's oral report corroborated Hornof's detailed submissions, the government was provided a counsel-prepared summary, and the government received the detailed report (over 100 pages with exhibits) once it was prepared shortly after the July 7 arrival in South Portland.

13. When the vessel arrived, the movants were granted entry into the United States. As Zak's contract was expired, CBP officials approved his flight home the next day.

14. All three movants cooperated fully and completely with the government's subsequent investigation. Mr. Hornof's cooperation extended over many days. The government's trial exhibits include drawings he prepared for the government. He accompanied Coast Guard Lt. Franson and other Coast Guard officials to the engine room many times to explain Hornof's own investigation, point out the tanks he had sampled, and how the complex discharge system worked, to explain both the lawful and unlawful uses of the altered piping, and to retrieve and turn over one key section of piping that had been removed. As the government's trial brief documents, all three movants provided the information (and each is prepared to provide the testimony) that was (and is) the backbone of the government's case, and of course the government knew, even before the vessel arrived, that Third Engineer Hornof had already disclosed the misdeeds and, indeed, had ended them.

15. The movants were and are disappointed, however, that all parties treated them as follows:

   a. Their entry was illegally revoked, without explanation or right to hearing or appeal;

   b. They were detained onboard and under guard for over a week;

   c. Mr. Zak's permission to fly home was illegally revoked, again without hearing or right of appeal;

d. At the end of the week's detention the defendants – at the government's insistence – literally posted the movants and other crewmembers as human collateral for the release of the defendants' vessel;

e. They were then involuntarily "paroled" into the United States and expressly prohibited from having their attorney assist in that process;

f. In early August, Mr. Hornof politely requested that after his grand jury testimony he be allowed to return home because on July 30 his pregnant wife's mother had died, promising of course to return as needed. Rather than grant the request, when Mr. Hornof appeared for his grand jury testimony, the government falsely claimed the grand jury "does not have time" to hear his testimony. That same day the government applied for an *ex parte* warrant for Mr. Hornof's arrest, making many false assertions, including that Mr. Hornof's arrest was needed to secure the very same testimony he had that day attempted to present.

g. Each of the witnesses was similarly arrested on warrants secured with false assertions. (Each requested hearings to establish that the applications were both false and unnecessary; no *Franks*-type hearings were ever conducted, however, because the requests were ruled moot when the movants were allowed to go home on September 14, after giving trial depositions.)

h. Mr. Zak and Mr. Kordic were fired from their jobs;

i. Mr. Kordic, partially disabled and nearly 60, is confident he will never work again. He is bankrupt and about to lose his phone and internet service.[2]

---

[2] He has been able to retain the services because counsel provided the necessary funds.

j. When the movants returned for trial in May, no one thanked them. To the contrary, when the interpreter present for the change of plea hearing attempted to help counsel explain what had transpired, government counsel told her she could not.

k. None of the movants has returned to sea; it is likely they will not.

## DISCUSSION

### I. Each Movant Deserves an Award

Section 1908(a) provides:

> Criminal penalties. A person who knowingly violates the MARPOL Protocol, Annex IV to the Antarctic Protocol, this Act, or the regulations issued thereunder commits a Class D felony. In the discretion of the Court, an amount equal to not more than ½ of such fine may be paid to the person giving information leading to conviction.

The government has previously argued that the movants do not deserve awards because Messrs. Zak and Kordic participated in the discharges and because the movants made their first disclosures to the defendants, and not the United States, and were not therefore "true whistleblowers," and because they requested reasonable liberty rather than stay in the United States indefinitely. The term "whistleblower," of course, does not appear in the statute. Each movant is plainly a "person [who gave] information leading to [any APPS] conviction."

Counsel has found no rules or regulations implementing the statutory authorization. At least three cases discuss it in some detail, though it obviously has been utilized in many others: *United States v. Overseas Shipholding Group, Inc.*, 547 F. Supp. 2d 75 (D. Mass. 2008), *aff'd in part and vacated in part*, 672 F. Supp. 2d 188 (D. Mass. 2009), *aff'd in part and rev'd in part*, 625 F.3d 1, 2011 AMC 1988 (1st Cir. 2010); *United States v. Efploia Shipping Co., S.A.*, 2016 U.S. Dist. LEXIS 108603 (D. Md. July 22, 2016); and *United States v. MST Mineralien Schiffahrt Spedition und Transp. GmbH*, 2016 U.S. Dist. LEXIS 107238 (D. Minn. Aug. 12, 2016).

7

Those decisions and the government's filings in those and other cases undermine the proposition that awards should be or have been reduced, withheld, or denied when persons "providing information" provide it first to the ship's owner or manager or participate in discharges when ordered to do so or ask to be allowed to go home. To the contrary, in *United States v. MST,* the government moved for an award of $200,000 to each of two MST crewmen – or one-half of the total criminal fines of $800,000 – for two seafarers who had so participated in discharges under orders to do so, but who provided information indirectly to the Coast Guard. A copy of the motion is attached as **EXHIBIT A**. MST objected on the grounds that the seafarers were part of the problem and should have reported the discharges first to it. The Court awarded each seafarer only $51,000, expressly noting that "is not so high, in the Court's judgment, as to de-incentivize internal reports in international waters," suggesting the court (of course) *preferred* and sought to "incentivize" precisely the conduct of these three movants. And the terms of probation imposed in the MST case expressly required it to set up a system for reporting pollution events through MST, as documented in **EXHIBIT B**.

Attached as **EXHIBIT C** is the motion the government filed in the above-cited *Overseas Shipholding Group* case, requesting awards of $437,500 for each of twelve seafarers who provided information leading to related criminal prosecutions *some* of which resulted in APPS awards. The motion includes detailed descriptions of the roles each seafarer played. Many of them participated in discharges under "orders" from senior officials. Most did *not* report the misconduct directly to U.S. officials. Many initially provided their information to OSG. Several made that first disclosure only after MST was under investigation by the government. Most of them did not spend extended periods of time in the United States. Several of them came to the United States under subpoena and were allowed to leave and return only needed. *None* of them

8

stopped pollution cold and in its tracks on the high seas – as Mr. Hornof did with the assistance of Messrs. Zak and Kordic.

Awards to each movant would serve *all* the reasons the government traditionally identifies in requesting awards and all reasons courts have recognized:

a. They not only reported, but stopped the pollution;

b. Their initial report was to the wrongdoer, then the Master, then the company, then the MARPOL administration, then the U.S. government, which is precisely as MARPOL and all reason and precedent would suggest is ideal;

c. They risked their jobs; and two movants were fired ostensibly for following the direct orders of their superior;

d. They suffered great damage to their careers;

e. They provided all requested cooperation and much that was not requested;

f. Their lives have been disrupted;

g. They spent two-and-a-half months in the United States;

h. They travelled to the U.S. for trial once and are on standby for their second such trip; and

i. They are good, honorable, honest seafarers, who have fought to protect the oceans, but also for fair treatment of fellow seafaerers, a group that deserves greater protection.

## II. The APPS Award Limit Should Apply to Each Movant Separately, and to Any Fine Under the Obstruction Count

Section 1908 limits an award to one-half of the fine to "the person" providing information leading to a conviction. Movants respectfully submit the statute should be interpreted as applying to each such person. So that, for example, Mr. Hornof could receive one-half of any APPS find and Messrs. Kordic and Zak could each receive one-quarter.

Movants also respectfully submit that if a fine is imposed under APPS, the court may also make a section 1908 award from any fine allocated to the obstruction count. All nine of the

9

charges in the indictment, *including* the obstruction charge, are predicated on violations of a rule promulgated under the APPS. Nothing in section 1908(a) precludes the Court from basing an award based on the total fine in these circumstances. The statute provides: "a person who knowingly violates the MARPOL Protocol. . . [APPS], or the regulations issued thereunder commits a class D felony. In the discretion of the Court, an amount equal to not more than ½ of such fine may be paid to the person giving information leading to conviction." The term "such fine" is imprecise, in that there is no antecedent mention of a fine. A fair interpretation is a fine imposed as a result of a violation of APPS or regulations thereunder, which is not the same as a fine *for* a violation of APPS. "Conviction" is even more open-ended, since the statute does not even bother to say "such conviction." Section 1908(a) has never been construed to limit awards to persons who provided information that was used directly to secure a conviction under APPS. For example, in *United States v. Overseas Shipholding Group, Inc.*, 547 F. Supp. 2d 75 (D. Mass. 2008), *aff'd in part and vacated in part*, 672 F. Supp. 2d 188 (D. Mass. 2009), *aff'd in part and rev'd in part*, 625 F.3d 1, 2011 AMC 1988 (1st Cir. 2010), four crewmembers of a vessel that was arrested in Texas gave information about MARPOL violations committed on that ship; but all charges pertaining to that ship were dismissed by the district court in Texas. Nonetheless, the crewmembers were awarded over $400,000 *each* by the court in Massachusetts, because the information was useful in arriving at a substantial fine under *other* charges in that district..

### III. The Court Should Reject Any Agreement that Allocates Most of Any Fine to the Obstruction Count

The movants do not object and never objected to a $3,200,000 fine as inappropriate. They respectfully object to any agreement that allocates most of any fine to the obstruction count, and respectfully submit that any such agreement results exclusively from a desire to

10

restrict the Court's authority to make an award. They also respectfully submit that unless the defendants admit that the obstruction count caused pecuniary loss or pecuniary gain of one-half of any agreed-upon fine, any fine in excess of the $500,000 statutory cap is improper and unlawful.

The movants do not know what agreement was made. They did, however, in good faith and to try to facilitate a just resolution, suggest that MST might simply agree to plead guilty to seven APPS counts plus obstruction, with the $3,200,000 being evenly allocated. They were told MST agreed and that the government did not, and they have no reason to doubt what they were told. They also respectfully submit that, unless the defendants have now agreed to a higher total fine, there is no creditable reason the government would have rejected that proposal other than to limit potential APPS awards.

The movants understand that the Court has suggested a one-count fine above $500,000 might be appropriate under the Alternative Fines Act because pollution on the high seas causes a "loss [that] is intangible and the value is subjective." They respectfully submit that such a loss is not a "pecuniary loss" within the meaning of the AFA. Moreover, the courts appear uniform in holding that international discharges are not relevant conduct for purposes of sentencing in an APPS case brought in the United States and that the pollution is not "caused" by the offense. *E.g., United States v. Abrogar*, 459 F.3d 430 (3rd Cir. 2006).

Most fundamentally, though, Supreme Court and First Circuit precedents make clear that a crime causing "pecuniary gain" or "pecuniary loss" and therefore resulting in a higher fine under the AFA is an "aggravated" crime; and the aggravating element must be charged by indictment and proven to a jury beyond a reasonable doubt or admitted by the defendant. *See, e.g., Southern Union Co. v. United States*, 567 U.S. 343 (2012)[reversing First Circuit and holding that *Apprendi* doctrine applies to fines]; *United States v. Garay-Sierra,* 832 F.3d 64, 68

11

(1st Cir. 2016)[recognizing that facts that increase minimum or maximum penalties create "aggravated crimes"]. *United States v. Melendez*, 775 F.3d 50 (1st Cir. 2014)[same].

The indictment clearly does not allege the aggravating element, *i.e.* the pecuniary gain or loss. Perhaps the defendants will admit that their obstruction caused pecuniary gain or pecuniary loss. But if defendants do not, then the movants respectfully submit that it would be improper for the defendants to agree to – or the Court to approve – a plea to an aggravated crime the defendants do not admit they committed solely to deprive the movants of a potential award (subject to the Court's discretion) under section 1908. They also respectfully ask the Court, even if it disagrees with this analysis, to employ its discretion to reject any such agreement.

WHEREFORE, Jaroslav Hornof, Damir Kordic and Lukas Zak respectfully request leave to be heard concerning any plea agreement in this matter and for awards to be ordered under section 1908.

Respectfully submitted this 2nd day of November, 2018.

_____
Edward S. MacColl *(MBN 2658)*

_____
Marshall J. Tinkle *(MBN 2833)*
Counsel for Movants
Jaroslav Hornof, Damir Kordic and
Lukas Zak

THOMPSON, MACCOLL & BASS, LLC, P.A.
15 Monument Square, 4th Floor
P.O. Box 447
Portland, ME 04112-0447
(207) 774-7600

## CERTIFICATE OF SERVICE

I hereby certify that I this day mailed and emailed the foregoing Motion of Jaroslav Hornof, Damir Kordic and Lukas Zak to the following:

12

John D. Cashman,
US DOJ Environmental Crimes Section
601 D Street, NW, Room 2140
Washington DC  20004
Email: *john.cashman@usdoj.gov*

George Michael Chalos, Attorney *pro hac vice*
Chalos & Co., P.C.
55 Hamilton Ave.
Oyster Bay NY  11771
Email: *gmc@chaloslaw.com*

Briton P. Sparkman, Esq.
Chalos & Co., P.C.
55 Hamilton Ave.
Oyster Bay NY  11771
Email: *bsparkman@chaloslaw.com*

Peter E. Rodway, Esq.
Rodway & Horodyski
120 Exchange St., 4th Floor
PO Box 444
Portland ME  04101
Email: *rodlaw@maine.rr.com*

_____
Edward S. MacColl